## Case No. 14,950.

### UNITED STATES v. DE RODRIGUEZ et al.

[7 Sawy. 617.] [1]

District Court, N. D. California. Nov. 26, 1864.

MEXICAN LAND GRANT—EXCEPTIONS TO SURVEY—BOUNDARIES.

[When the dividing line between two ranchos has been fixed in proceedings for the confirmation of one of them, to which the claimant of the other was a party, such line should not be disturbed on exceptions to the official survey of the latter rancho, when this would involve the issue of overlapping patents creating certain litigation, and a possible loss by the claimant of the former rancho of part of the land confirmed to him in such proceedings.]

[Claim by Maria Concepcion Valencia de Rodriguez and others to the Rancho San Francisquito, in Santa Clara county, granted May 1, 1839, by Juan B. Alvarado to Antonio

---

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

Buelna. The claim was confirmed by the commission November 28, 1854, by the district court February 4, 1856, and appeal dismissed April 2, 1857.]

HOFFMAN, District Judge. This case comes upon exceptions to the official survey filed on the part of the United States and on the part of the neighboring rancheros. To understand correctly the question raised, a brief review of the proceedings to obtain the grant, and those which resulted in the confirmation, is necessary.

The original petition of Buelna asked for the place called San Francisquito, "to the extent of eight suertes of two hundred varas square each, making sixteen hundred, according to the reglamento of colonization." The language of the decree of concession, and of the grant, is somewhat involved; but the land is clearly enough described as eight suertes of two hundred varas each, including the land lying between the Chemisal and the San Francisquito creek, and extending from the upper crossing of the road leading to the sierra to the road leading from Santa Clara to San Francisco, known as the "Middle Road."

The third condition describes the land granted as of the extent of two-thirds of a league, a little more or less. On the diseño attached to the expediente, the boundaries mentioned in the grant are clearly exhibited. On the north is the brook; running parallel with it, and at a short distance to the south, is the Chemisal. On the west is the road to the sierra, which crosses the brook, and on the east is the middle road. It would seem, however, that the grant was not intended to extend as far as this road, for a little to the west of it a line is drawn from the Chemisal to the brook marked "raya," indicating that it is the eastern boundary of the tract. On the corner of the diseño is a note, stating that the land is of the extent of eight suertes.

I have been unable to understand the meaning of the clause in the third condition, stating the land to be of the extent of two-thirds of a league. If the eight suertes asked for were to be each two hundred varas square, the total area of the tract would be three hundred and twenty thousand square varas. A square league is five thousand varas square, and its area is twenty-five million of varas.

Parol testimony was taken before the board of land commissioners to show that a juridical possession was given of the land by metes and bounds. No record of the act of possession was produced, but the board confirmed the claim according to the juridical possession, as sworn to by the witnesses. Its decree sets forth particularly the boundaries of the tract, and states the extent of land confirmed to be "two-thirds of a league, a little more or less." This decree was affirmed on appeal to this court, the United States offering no opposition. The tract thus described extends to a considerable distance to the south of the Chemisal, between which and the San Francisquito creek both the decree of concession and the grant describe the land as situated. It also extends to the eastward beyond the line marked "raya," which the diseño designates as a boundary in that direction. In the official survey, the calls of the decree seem to have been wholly disregarded, as also the indication of the map, which the claimants themselves presented to the board as a correct survey of the tract of which judicial possession was given. The most that the claimants can ask for is that the boundaries called for in the decree be followed. I cannot perceive, therefore, how the official survey can be sustained.

It is objected, however, on the part of the owners of the adjoining rancho, confirmed to the heirs of Mesa, that the dividing line between the ranchos has already been fixed in a proceeding to which the present claimant was a party, and that that line must be adopted in fixing the boundaries of the claimant's land, notwithstanding that it is a different line from that described in his decree of confirmation. It appears that when the Mesa Rancho was surveyed, objections to the survey were filed, and the proceedings required by the act of 1860 [12 Stat. 33] were taken. The owners of the Rodriguez Rancho intervened, and were heard, and the court, after due deliberation, located the Mesa Rancho as appeared to be just under the decree of confirmation and the evidence in the case.

On the part of the owners of the Mesa Rancho, it is contended that the location of the common boundary between the ranchos has thus become res adjudicata, not only as against the United States, but as against the owners of the Rodriguez Rancho, who were parties to the proceeding, and who might have appealed if dissatisfied with the decree; that the object and effect of the proceedings under the law of 1860 were to settle disputes of this nature between contiguous proprietors; and that, inasmuch as the Mesa Rancho has been finally located, the Rodriguez Rancho cannot be made to include a part of the same land, unless overlapping patents be issued, which is never done by the United States.

On the part of the present claimants, it is urged that the final decree obtained by them gives a definite location to their land; that it describes the boundaries clearly and specifically; that it in terms adopts the judicial measurement testified to in the cause; that their rights are thus fixed and determined by the decree; and that the power of the court, under the act of 1860, is limited to an inquiry, whether the survey is in accordance with the terms of the decree.

It is also urged that the intervention in the case of Mesa had for its object to prevent the boundaries of that rancho from being so fixed as to include any portion of the land

already confirmed to the claimants, and thus to avoid future dispute and litigation; that although this object was not attained, yet that their own rights under their decree were not waived by them; that the adjudication in that suit only fixed the boundaries of the Mesa Rancho—it did not, and could not, affect the boundaries of the Rodriguez Rancho, already established by the decree of confirmation, and which was not then before the court; and that they are now entitled to have their land surveyed as described in their final decree of confirmation, notwithstanding that they include lands already embraced in the Mesa survey.

It will be perceived that the question thus presented is difficult and important.

Since the argument of this cause, the opinion of the supreme court in the Case of Fossat [2 Wall. (69 U. S.) 649] has been received. Before proceeding to inquire how far the decision in that case disposes of the questions raised in the case at bar, I deem it due to myself to correct some misapprehensions, as to matters of fact, into which both the counsel who argued the cause and the supreme court appear to have fallen.

The opinion, after detailing the previous history of the cause up to the time when the survey was ordered into this court, under the provisions of the act of 1860, states that the district court entered an order reforming the survey as to the eastern line. "This direction," the court observes, "not only reformed the survey of the tract, as made by the surveyor general, but reformed the decree itself of the court, entered on the eighteenth of October, 1858, in pursuance of which the survey had been made. The court assumed that the survey and location of the tract were not to be governed by the decree, but on the contrary, that it was open to the court to revise, alter, and change it at discretion, and to require the surveyor general to conform his survey and location to any new or amended decree—for certainly if it was competent to change the eastern line from that settled in the decree, it was equally competent for it to change every other line or boundary as there described and fixed."

"Now it must be remembered that this decree of the district court, designating with great exactness this eastern line—with such exactness that the surveyor general had no difficulty in its location—was entered in pursuance of and in accordance with the mandate of this court, and by which that court was instructed, at the time of the dismissal of the appeal, that the three external lines declared in it were in conformity with the opinion of this court, and that the other line— the north line—only remained to be completed by a survey to be made, and that this line was to be governed by quantity, which quantity had been previously determined."

"This radical change, therefore, of the eastern line of the tract. involves something more than a change by the court of its own decree; it is the change of a decree, entered in conformity with the mandate of this court."

If it be true, as here stated, that a subordinate judge has not only radically changed his own decree, without color of authority, but that the decree so changed was one "in conformity with the opinion" of the superior tribunal, his action would deserve stronger language of censure than the supreme court has used.

I shall show, however: (1) That no decision as to the eastern line of the Fossat claim was ever made by this court until its last decree in the proceedings had under the act of 1860; that the questions in regard to the location of that line were never until then argued or submitted to the decision of the court; and, further, that under the rulings of the supreme court, this court had, prior to the act of 1860, no jurisdiction to locate and establish that line. (2) That this court had no reason to suspect that any supposed decision with regard to that line had been affirmed, or in any way passed upon by the supreme court; that when the location of the eastern line was, in a proceeding taken under the act of 1860, for the first time submitted to this court, it was not suggested by any of the counsel that the supreme court had affirmed or expressed any opinion whatever upon the correctness of the location of even the southern line; which had been argued and decided by this court, still less upon the location of the eastern line, which had not been argued, and which, it was universally conceded, could not be determined in a proceeding to which the adjoining owner was not a party. (3) That even if the location of the eastern line had been determined by this court. and if that determination had been affirmed by the supreme court, there were good reasons for believing that, under the act of 1860, it was the duty of the court, on the intervention of Berreyesa, then for the first time heard in the cause, to determine the line according to justice and right, and irrespective of any decree obtained by either party in a proceeding between himself and the United States.

I. By the act of March 3, 1851 [9 Stat. 631], the board of commissioners and the courts on appeal were empowered to decide only upon "the validity" of land claims. This act differed from the laws of 1824 [4 Stat. 52] and 1828 [Id. 292] in withholding the power, conferred by those acts on the courts, of deciding "all matters relative to the extent, locality and boundaries" of the claims. The controversy was strictly limited to the United States and the claimants, and third persons were not permitted to intervene. But the law provided that their rights should not be affected by the decree or patents under them. The duty of locating finally confirmed land claims, was confided to the surveyor-general; and with respect to interfering or conflicting claims, he was authorized to de-

cide in the first instance, leaving to the parties interested the right of recourse to the ordinary tribunals.

That such was the true construction and effect of the law was explicitly decided by the supreme court. In U. S. v. Fossat, 20 How. [61 U. S.] 413, certain adversary claimants had been permitted to appear, and adduce evidence in the name of the United States. The supreme court says:

"It is the opinion of the court that the intervention of adversary claimants, in the suit of a petitioner under the act of 1851, for the confirmation of his claim to land in California, is a practice not to be encouraged. The board of commissioners was instituted by congress to obtain a prompt decision on the validity of private land claims, to enable the government to distinguish the public lands from that which had been severed from the public domain by Mexico; and that it might fulfil the obligation assumed at the time of the cession of California, to secure and protect the property of its inhabitants.

"The jurisdiction of the board of commissioners in the first instance, and the appellate jurisdiction of the courts of the United States, is limited to the making of decisions on the validity of the claim, preliminary to its location and survey by the surveyor general of California, acting under the laws of the United States. This officer is required to survey and furnish plats of the claim that may be confirmed.

"In reference to interfering or conflicting claims, he is authorized to decide by adopting the lines agreed to by the claimants, and in the absence of an agreement to follow the rules of justice.

"The acts of congress provide that neither the decisions of the commissioners, nor of the district or supreme courts, nor of the surveyor general, shall preclude a legal investigation and decision by the proper judicial tribunal between parties having such interfering claims, * * * and a patent under the act is only conclusive between the United States and the claimant, and does not affect third parties. The language and policy of these enactments limit a controversy like the present to the United States and the claimants." 20 How. [61 U. S.] 424.

This decision, though made subsequently to the first decree of this court, in the Fossat Case, merely affirmed the correctness of the construction previously given by the board, the court, and the bar, to the provisions of the statute.

When, therefore, the Case of Fossat was presented, it was contended by the district attorney that the court had no authority whatever to fix any of the boundaries of the tract, not even those between it and the public land, but that all questions of boundary and location must be determined by the surveyor general. It was considered, however, by the court, that an inquiry into the validity of a claim necessarily involved, to a cer-

tain extent, inquiries into its location and extent, and that when a question arose between the United States and the claimant, as to the identity of a natural object called for in the grant, and which formed the boundary between the land granted and the public land, it was the duty of the court to hear and determine the dispute. The correctness of this view was explicitly affirmed at a subsequent stage of the cause by the supreme court. U. S. v. Fossat, 21 How. [62 U. S.] 449.

But, with regard to the dividing lines between the claimant and a neighbor, when the controversy related to lands admitted to belong to one or the other, and therefore private, it was universally conceded that the court had no jurisdiction to determine it, especially as the adjoining owner had no right to intervene in the suit, and no decision of the disputed boundary could affect his rights. The evidence and arguments in the cause were, therefore, exclusively directed to the question raised with regard to the southern boundary.

The location of the eastern line was not disputed or discussed, nor was any question respecting it submitted to the court. So, as far as the record disclosed, there was nothing to show that the location of that line was in controversy.

The court was aware, however, that with regard to that line a dispute in fact existed. This dispute was understood to arise from a supposed repugnancy between the description of the line contained in the grants and the delineation of it on the diseño of Berreyesa.

The decree of the court, therefore, after determining the southern boundary, describes the eastern line in the language of the grants, but it especially refers to and adopts the dotted line marked on the diseño of Berreyesa, as indicating the boundary between the ranchos. And it was supposed that by these means all questions between the claimants, under Larios and Berreyesa, would be left open and undecided. Such, even yet, appears to me to be the fair construction of the decree.

The case having been appealed, the decree of this court was reversed on points hereafter to be referred to, and the cause was remanded to this court with instructions "to declare the three external boundaries designated in the grant, from the evidence on file and additional evidence to be taken." It is in the opinion then delivered by the supreme court, that the declarations above cited, with regard to the jurisdiction of the court and the determination by the surveyor-general of lines between conflicting and interfering claims, are found. Any doubt which this court might have entertained as to its authority to determine, in the absence of Berreyesa, the disputed line between the ranchos, was dissipated by the very explicit language of the supreme court.

On the return of the cause, further evidence was taken, and counsel were heard. The location of the eastern was, as before, not debated, and the arguments related solely to the location of the southern line. The court, in its decree, reaffirmed its previous decision with regard to that line. The eastern line was described as before, in the language of the grants, and the dotted line on the diseño was again carefully referred to and adopted, as indicating the boundary between the ranchos. An appeal having been taken from this decree, it was held by the supreme court that the decree was interlocutory, and not final; that the northern line, which was merely described as a line to be run for quantity, should have been fixed upon the ground by a survey. The appeal was therefore dismissed.

The cause having been remanded to this court, no further proceedings in it were had until after the passage of the act of 1860, when the counsel for the claimant moved for and obtained an order directing the surveyor to survey the tract, and to give notice according to the provisions of that act, of the approval of the plat and survey. This was done, and the survey was ordered into court on the application of the Berreyesas, who thus for the first time became parties to the cause. Their own rancho had also been surveyed, and the same dividing line adopted by the surveyor as in the Fossat survey. This survey was also on their application ordered into court, and the Quicksilver Mining Company, claiming under Larios, and the New Almaden Company, intervened and became parties to the proceeding. All parties being thus before the court, evidence was taken and argument heard relative to the location of the eastern line. The location of that line was then for the first time decided by the court.

It was not suggested by any of the counsel that this question had ever before been submitted to or passed upon by the court. They knew the fact to be otherwise. Nor was it contended that the language of any previous decree in the suit of Fossat v. U. S. imported a decision of the question. It was not, to my recollection, hinted by any one, nor did the idea occur to the court, that any decision of this court supposed to determine that line had in any way been affirmed, or even considered, by the supreme court. The question was on all sides treated as still open and undecided, and this court proceeded to determine it, without the remotest suspicion that its action was irregular or unauthorized. Its determination, though then for the first time judicially declared, was in accordance with the opinion it had entertained from the time when, in an ejectment suit brought long before in the circuit court, the counsel for the New Almaden Company had contended for the location of the eastern line, as claimed by the representatives of Larios.

That opinion has been adjudged by the supreme court to be erroneous; but as this court has been supposed to have not only departed from its decrees, but to have changed its opinions, I shall be pardoned, I trust, for stating, with all deference to the superior judgment of the appellate tribunal, that notwithstanding all that has been said, I am still unable to discover the error of the final decision of this court by which the line between the ranchos was determined. I believe that the history and nature of the dispute between the grantees, their evident and necessary object in fixing upon the line, and, above all, the plain and palpable delineation of it upon the diseño, unmistakably show the intention and understanding of the parties; that to this evidence, the words of the grants, which are very obscure, and which were intended to describe a line already agreed upon by the parties, and delineated on the diseño as a substitute for an actual marking on the ground, ought to yield; that to carry out the principal and controlling intention of the parties, either the call in the grants for the "falda," or that for "a straight line," must be sacrificed—which of them, was practically immaterial, for they were both of equal dignity; but both were, in my judgment, subordinate to the mute but visible call of the diseño, which showed how the line was to be drawn, where it was to strike the sierra, and how the valley was to be divided between the disputants.

On these grounds I believe that Castillero, who denounced the mine, Pico, the alcalde, Berreyesa himself, and, so far as we know, the neighbors and contemporaneous inhabitants of the country, were not all mistaken, when without doubt or dispute they asserted the recently discovered quicksilver mine to be "on the lands of the retired sergeant Jose Reyes Berreyesa."

But whatever may be thought of the correctness of these views, it is certain that the location of the eastern line was never adjudicated by this court until its last decree was made, and that in that adjudication, whether erroneous or not, it did not revise, or change, or alter, as has been supposed by the supreme court, any previous decision of its own, with respect to the location of that line.

II. I shall not show that this court had no reason to suspect that any decree supposed to determine that line had ever been affirmed by, or declared to be in conformity with, "the opinion of the supreme court."

The first decree of this court confirmed the title of the claimant to the easterly portion of the valley described in his petition as the Canada de los Capitancillos. This valley is on the north and south bounded by parallel ranges of hills, and the tract confirmed was limited on the west by the Arroyo Seco, and on the east by the line agreed

on between Larios and Berreyesa, the latter of whom had obtained a grant for the easterly portion of the valley.

The third condition of the grant declared the land to be of the "extent of one square league, a little more or less (poco mas o menos), as explained by the map accompanying the expediente."

In the grant, only three boundaries were mentioned, viz. the southern, the western, and the eastern. But the diseño to which the grant referred plainly represented the range of hills which formed the northern limit of the valley, while the designation in the petition of the land solicited as the valley of the Capitancillos and the situation of the petitioner's house, seemed to indicate unmistakably that the tract asked for and granted was the canada or valley extending from the Arroyo Seco on the west to the land ' of Berreyesa on the east.

On the argument, the only disputed boundary was the southern. It was claimed by the United States and the counsel for the New Almaden Company, that the "sierra" called for in the grant was the base of a range of foot-hills, or "lomas bajas;" while the claimant contended, that by that term the chain of high mountains behind and parallel to the "lomas" was evidently referred to. The court adopted the latter view.

There was, therefore, confirmed to the claimant the valley lying between the sierra on the south and the pueblo hills on the north—and extending from the Arroyo Seco to the agreed line of division between the ranchos. Its extent was, as the grant declared, a little more than one square league; but how much more could not be ascertained until the dispute with Berreyesa, in regard to the dividing line, should be finally settled.

This decree was reversed by the supreme court on appeal. It was held by that court, that, as only three boundaries were mentioned in the grant, there "was no other criterion for determining the fourth, or northern boundary, than the limitation of the quantity as expressed in the third condition." The words "poco mas o menos" were rejected, as "having no meaning in a system of survey and location like that of the United States," and the court. observed: "If the limitation of the quantity had not been so explicitly declared, it might have been proper to refer to the petition and diseño, or to have inquired if · the name 'Capitancillos' had any significance as connected with the limits of the tract." The grant to Larios was therefore declared to be "for one league of land, to be taken within the southern, western, and ·eastern boundaries designated therein, and to be located at the election of the grantee, or his assigns, under the restrictions established for the location and survey of private land claims in California by the executive department of this government."

The district court was directed "to declare the external boundaries designated in the grant, from the evidence on file, and such other evidence as may be produced before it." [U. S. v. Fossat] 20 How. [61 U. S.] 427.

It will not, I presume, be contended that this opinion, or the mandate in pursuance of it, in any respect constituted an affirmance of the decision of this court with regard to boundaries.

The location of the southern boundary, which was the principal question discussed in the court below, is not alluded to; no intimation is given whether, in the opinion of the supreme court, the "sierra" mentioned in the grant was the range of low hills or the mountain chain behind it, and the cause is remanded, with direction to this court to declare the three boundaries mentioned in the grant from the evidence on file, and such other evidence as may be produced, clearly showing that the supreme court intended to keep the question as to the location of those boundaries open and undecided, and that they supposed it might be elucidated by further testimony.

On the return of the cause, further testimony was taken, and the location of the southern boundary reargued. This court reaffirmed its previous judgment with respect to that line, and after describing, as has been stated, the eastern line in the language of the grants, with a reference to and adoption of the dotted line on the Berreyesa diseño, directed, in the very language of the supreme court, the northern line to ·be run for quantity "at the election of the grantee or his assigns, under the restrictions established for the location and survey of private land claims in California by the executive department of this government."

It is evident that no more precise decree could have been made without an actual survey, which it had not, up to that time, been supposed this court had power to order, nor could a final survey have been made at that stage of the cause, for the northern line being required to be run for quantity, it obviously could not be run until all the other lines were established, and no establishment of the eastern line or disputed boundary between Larios and Berreyesa could be made in a proceeding wherein, by the express decision of the supreme court, the latter was not permitted to intervene, and the decree in which could have no effect upon his rights.

It will also be observed that the refusal of the supreme court to recognize the natural boundary of the valley on the north, as the northern limit of the tract, and the direction to this court to locate the league "within" the three other boundaries, and to run the northern line for quantity, at the election of the grantee, necessarily compelled this court to locate the grant, in great part, among the hills toward the south.

If, then, there be in the final survey the anomaly of locating a grant for a valley among the mountains, excluding the valley

solicited, it has been the direct and inevitable result of the instructions given to this court by its superior.

From the second decree of this court, an appeal was again taken, and a decision as to the disputed southern line was on all hands confidently expected.

That expectation was not fulfilled. When the cause came up, a doubt was suggested by the chief justice, "whether there had been a final decision by the district court under the mandate, and whether the appeal ought not to be dismissed on that ground."

On this suggestion a motion to dismiss was made and argued.

The merits of the case do not appear to have been alluded to in the argument of the counsel. They certainly are not referred to in the opinion of the court.

It was decided that the decree appealed from was not a final decree, and the appeal was dismissed.

In the opinion, the court, after reciting its previous direction to this court to declare the external boundaries designated in the grant, from the evidence on file, and such further evidence as might be produced, says: "The district court, in conformity with the directions of the decree, declared the external lines on the sides of the tract, leaving the other line to be completed by a survey to be made. From the decree in this form the United States have appealed. A motion has been submitted to the court for the dismissal of the appeal, because the decree was interlocutory, and not final." [U. S. v. Fossat] 21 How. [62 U. S.] 447.

This statement of the action of this court is in all respects accurate. I am to this day unable to perceive what else, or what more this court could have done under the mandate and under the law as it had been up to that time expounded by the supreme court.

But I must be permitted to express my profound astonishment at discovering that this simple sentence, which states the action of this court under the previous mandate, has been considered as amounting to an affirmance by the supreme court of the correctness of the location, not only of the southern line, which had been discussed and decided, but also of that of the eastern line, which had never been argued, which was an interfering claim, declared by the supreme court, to be left by law to the decision of the surveyor general, and which it seemed repugnant to reason and justice to decide finally, in any controversy to which Berreyesa was not and could not be a party.

But, even with respect to the southern line, it was not for a moment suspected by this court, nor was it even suggested by counsel, that the supreme court, on a preliminary motion to dismiss an appeal, without hearing argument on the merits, without alluding to the grave and difficult question involved, meant, at the moment it was deciding the decree appealed from to be interlocutory and not final, and thus, in effect, declaring itself without jurisdiction, to finally pass upon and determine every question involved in the case.

That such was its intention I am bound to conclude from its recent opinion. On that supposition alone can the observation above cited, that "the change of the eastern line by this court involves something more than a change by that court of its own decree—it is the change of a decree in conformity with the mandate of this court,"—be accounted for.

I have thus, I believe, established beyond all doubt or controversy, that if this court has changed a decree, the correctness of which had been affirmed by the superior tribunal, it has done so unintentionally and unconsciously—and under circumstances which did not suggest nor could they reasonably have suggested to either court or counsel the construction which has since been given to the opinion and mandate of the supreme court.

III. I shall now show that if the eastern line had been fixed by this court, and even if that decision had been affirmed by the supreme court in a suit between Fossat and the United States, there were good grounds for believing that when, under the provisions of the act of 1860, Berreyesa, for the first time, became a party to the cause, and when under the same act his own rancho was before the court for location, in which proceeding the claimants under Justo Larios intervened, it was the right and duty of the court to determine in both suits the true location of the dividing line between the ranchos, irrespective of any decree obtained by either claimant in a suit to which his neighbor was not a party.

To fully understand the question here presented, a precise notion must be obtained of the circumstances which led to the passage of the law of 1860.

It has already been stated that the supreme court dismissed the appeal from the second decree of this court on the ground that it was interlocutory, and not final. It was held that all the boundaries of the tract should have been ascertained and established by a survey, and a decree of confirmation entered for the tract surveyed.

In answer to the objection that the district court had no means of ascertaining the boundaries by a survey, or compelling the surveyor to execute its decree, that court declared that the district court had power to enforce the fulfilment by the surveyor of its decree, and added that "the power of the district court over the cause does not terminate until the issue of a patent conformably to its decree." [U. S. v. Fossat] 21 How. [62 U. S.] 451.

The decision was received here with surprise, but with great satisfaction. The authority thus attributed to this court was immediately invoked, and application was made in many cases for orders to the surveyor general to return into this court, for reform and correction, surveys alleged to be erroneous.

Before exercising this jurisdiction the court heard an argument, in which most of the

members of the bar concerned in land cases participated, as to the true construction and effect of the decision of the supreme court and the practice to be adopted under it. The views of the bar were various and conflicting. It was held, however, by the court, that the decision in question in effect overruled the previous decisions of the supreme court, which had declared the jurisdiction of the court to be "limited to making decisions upon the validity of land claims preliminary to their location and survey by the surveyor general," and that henceforth the court must assume the duty of correcting and reforming all surveys made under its decrees, when alleged to be erroneous.

This construction of its decision was recognized by the supreme court as correct in subsequent cases.

"In the case of U. S. v. Fossat, 21 How. [62 U. S.] 445, this court had occasion to refer to the limits of the authority of the courts of the United States under the act of March 3, 1851, above cited. We stated in that case that if questions of a judicial nature arose in the settlement of the location and boundary of grants confirmed to individuals, the district court was empowered to settle those questions upon a proper case being submitted to it before the issue of a patent, and in such case the judgment may properly be extended to the confirmation of the survey, and an order for the patent to issue." Castro v. Hendricks, 23 How. [64 U. S.] 442.

In the case of U. S. v. Berreyesa's Heirs, 23 How. [64 U. S.] 500, the supreme court says: "The appellees have requested the court to give instructions relative to the location and survey of this grant, similar to those found in the case of U. S. v. Fossat, 20 How. [61 U. S.] 425. But no question was decided in the court below upon the location of the lines of the tract, and it would be irregular for this court to assume that the action of that court will not conform to the established rules on the subject. The decree of the district court has not been called in question by the appellees; and should any difficulty arise in the location of the grant, it will be competent for the appellees to invoke the aid of that court."

This court having announced that it would exercise the new jurisdiction attributed to it, numerous surveys were ordered before it for revision and correction. The means thus offered of obtaining a judicial determination of the many difficult and important questions relative to the location of grants which had arisen were eagerly seized on by both the representatives of the United States and of the claimants, for it substituted an inquiry in court, where witnesses could be summoned, examined and cross-examined, where counsel could be heard and a decision rendered, the grounds of which were exposed in an opinion, and from which an appeal could be taken to the supreme court, for the quasi trial before the surveyor general, and for the still more unsatisfactory examination by an officer in Washington on ex parte affidavits, the contents of which, and even the fact that they had been forwarded, might be unknown to the party against whom they were taken.

But in the discharge of the duty thus imposed upon the court, great embarrassment was experienced. The supreme court had declared that the contest was limited to the United States and the claimants, and that third parties had no right to intervene. But it was obvious that the parties immediately affected by an erroneous location would often be colindantes or adjoining owners, between whom and the claimant a common boundary line was to be run, or purchasers from the original grantee of lands within the exterior boundaries, which might have been erroneously excluded from the survey, or grantees of the sobrante or excess within the exterior boundaries, who had a clear right to be heard as to the location of the first grant.

The United States, also, had an evident interest in requiring the dividing lines between the ranchos to be determined before the establishment of the lines to be run for quantity. For how could the latter be fixed while the former remained uncertain?

Although the court had power to hear and determine objections to surveys, no time was limited within which objections were to be made, except that it must be before the issue of a patent; nor were any means prescribed for giving notice to parties interested that a survey had been completed and approved by the surveyor-general. A survey, therefore, might be made, approved, transmitted to Washington, and a patent issued before, as was alleged to have happened in some cases; persons affected by it, and who would have objected to it, were apprised of the fact. Further legislation thus seemed to be indispensable. The law of 1860 was, therefore, recommended and passed, not to confer a new jurisdiction on the district courts, but, as its title imports, to define and regulate the jurisdiction the supreme court had already decided them to possess.

It provided in substance for a notice, by publication, of the approval of surveys by the surveyor general. It limited the time within which objections were to be taken. It permitted all parties interested to intervene and be heard, and it assigned a limited period (six months) for taking an appeal from the decisions of the district courts. These are similar provisions, I believe, to have been indispensably necessary for the proper discharge by the district courts of the duties imposed upon them by the decision in U. S. v. Fossat

I believe, also, that the law has been found, in practice, salutary and beneficial, and has been so regarded, almost universally, by the parties affected by it or acquainted

with its operation; and that the difficult and most important questions raised, with respect to the location of land claims. have been settled under it more justly and satisfactorily to all parties than, making due allowance for the errors of a court not claiming to be infallible, was practicable under any other system.

It has recently beer said, on very high authority, that the questions submitted by this law to the courts "involve the consideration of various matters not properly the subject of judicial inquiry," and that "it creates a new and anomalous jurisdiction in the court, which cannot be assumed independent of the act, and under it should be exercised only the cases coming clearly within its language."

I have already shown that the jurisdiction was declared by the supreme court substantially to exist, independently of and prior to the passage of the law of 1860. and that the act was passed to enable the district courts to carry out and give effect to the decision of the supreme court. That the jurisdiction conferred was not new or anomalous I shall now proceed to show

By the provisions of the act of May 26, 1824, relative to land claims in territory acquired under the Louisiana purchase, which provisions were, by the act of May 23, 1828, made applicable to land claims in Florida, the courts were charged with a double duty: (1) That of determining all questions arising in the cause, relative to the title of the claimant; and (2) all questions relative to the "extent, locality, and boundaries of the claim."

In defining the duties of the court under these acts, Mr. Justice Catron says: "First, the paper title to such private property it is our duty to investigate and ascertain, and by our decision to establish; and, secondly, it is our duty to ascertain and cause to be surveyed and marked by definite boundaries the lands granted." U. S. v. Forbes, 15 Pet. [40 U. S.] 182.

In the case of U. S. v. Lawton, 5 How. [46 U. S.] 28, the same justice holds substantially the same language.

Under the act of May 26, 1824, the proceedings were conducted according to the rules of a court of equity. All parties interested, or claimed to be interested, were brought before the court; process was served as in other cases, and the court had power to decide finally all questions and matters arising in the cause. U S. v. Moore, 12 How. [53 U. S.] 223.

Under the act of March 3, 1851, the jurisdiction of the courts is limited to the making of decisions on the validity of the title; process is not issued, nor are all parties in interest brought in, or permitted to intervene.

The survey and location of claims, which have been confirmed, are committed to the surveyor, who is even invested with a quasi judicial authority to decide upon conflicting or interfering claims.

But the decrees of the courts and surveys of the surveyor general, under the act of 1851, unlike the decrees and locations under the act of 1824, are conclusive only upon the United States and the claimants, and do not bind third parties. U. S. v. Fossat, 20 How. [61 U. S.] 425.

When, therefore, the supreme court, overruling its previous decision, attributed to this court jurisdiction, and made it its duty to fix the boundaries of the claim confirmed by an actual survey made under its direction, and declared that without such a survey the decree was not final, and that the jurisdiction of this court over the cause continued until the issue of a patent ([U. S. v. Fossat] 21 How. [62 U. S.] 450); and, when congress, by the law of 1860, regulated and provided for the exercise of this jurisdiction by authorizing the courts to review and correct the surveys of the surveyor general, after admitting all persons interested to become parties to the proceedings, the law, instead of being anomalous and exceptional, merely supplied a defect in the act of 1851, and brought the legislation, with regard to California land claims, into harmony with the previous legislation of congress in similar cases.

The defect of the law of 1851 consisted in giving to the courts jurisdiction to decide only upon the validity of claims, while questions of boundary and location were left to the decision of the surveyor-general. It thus attempted to separate. and subject to different modes of determination, inquiries in their nature almost inseparable.

The inquiry the courts were authorized to make, was only whether the claim was valid, as against the United States, and all inconvenience or injustice which might arise from the exclusion of third parties was supposed to be obviated by providing the decrees and patents should not affect their rights.

The supreme court, in its first decision in the Fossat Case, distinctly traced. as we have seen, the line of discrimination between the duties of the courts and those of the surveyor general. But even then it was apparent, and when the case came up again it was expressly recognized, that the inquiry into "validity" necessarily involved "questions of extent, quantity, location, and boundary, essential to be determined before even the 'validity' of the claim could be decided." The distribution of powers, contemplated by the statute, was thus found to be impracticable, and the line of discrimination between the duties of the surveyor general and those of the courts became obscure and undefined. Had the grants in California been for tracts bounded by natural limits, it might have been sufficient to determine the validity of the claim and establish its boundaries where it adjoined public land, leaving

the boundary lines between the claimant and his neighbors to be settled by a litigation inter partes.

But when the grants are for quantity, and the lines between the claimant's and the public land have to be drawn so as to include a certain area, it is obvious that no final, or at least no just, settlement of any of the boundaries can be made until the lines between the claimant and his neighbors are fixed. When, therefore, in its second opinion in the Fossat Case, the supreme court directed this court to cause the northern line, which was to be run for quantity, to be surveyed upon the ground, it is apparent that this direction could not have been complied with until the eastern line was located either finally or provisionally.

But that line was in dispute, and certainly no final determination of it could be made in a suit between the United States and Fossat, to which Berreyesa was a stranger.

But if it were merely fixed provisionally, and its final location still remained subject to future determination, to what end run other lines upon the ground, which depended upon and should be varied according to the future location of the eastern line?

I have referred more especially to the Case of Fossat, because its circumstances are well known; but similar difficulties were presented in every case where the court was asked to inquire into surveys which pretended to fix external lines required to be run for quantity, while the dividing lines between the claimant and his neighbors remain unsettled. The law of 1860 removed these difficulties, by enabling the neighbors to be heard and become parties. It supplied the omissions of the law of 1851, and gave to the court the jurisdiction, which they should have possessed from the beginning, to inquire and decide, as under the laws of 1824 and 1828, all questions of location and boundary, after first admitting as parties all persons interested. Why the questions thus submitted to the courts are less fit subjects for judicial inquiry than similar questions of disputed boundary, daily litigated in ejectment suits, I have been unable to perceive.

If all questions of location and boundary are to be left to the decision of executive officers, as well might we declare that the duty of the ordinary tribunals, in appropriate cases, is merely to pass upon the issues raised by pleas of non est factum, or devisavit vel non, but that all questions as to the construction and operation of the deed, or will, are to be decided by the marshal or the sheriff. The Case of Fossat, alone, would seem sufficient to apprise us, that a question of boundary involving such immense interests, to elucidate which volumes of depositions have been taken, and in which the briefs of counsel occupy hundreds of printed pages, is not in its own nature proper to be passed upon by merely executive officers,

without hearing the testimony of witnesses, the arguments of counsel, or using the other means of arriving at truth available in courts of justice.

The law of 1860 has been repealed. This court is thus relieved of what has hitherto been the most difficult, and the least grateful part of its duties. But as I was personally instrumental in procuring its passage, and as its wisdom and policy have been in high quarters doubted or assailed, I have thought it not improper to avail myself of this occasion to explain the grounds upon which it was recommended and believed to be necessary and beneficial.

The dismissal of the appeal from the second decree of this court, in the Case of Fossat, occasioned some embarrassment to the court and the counsel for the claimant. The supreme court had, in effect, decided that the decree was not final, because no survey of the land had been made. See last opinion of the supreme court in U. S. v. Fossat. The law of 1851, authorized the surveyor general to survey those lands only the claims to which had been finally confirmed. It thus seemed that there could be no final decree without a survey, and no survey without a final decree. The law of 1860 relieved the counsel for the claimant from this dilemma. He accordingly moved for and obtained an order, directing the surveyor general to survey the tract confirmed to Fossat, and on the approval by him of the plat and survey thereof, to give notice of such approval, as required by the act of congress approved June 14, 1860.

No opposition was made to the granting of this motion. The order appears to have been entered on the day the motion was made. The original is on file, signed by the judge, but drawn by and in the handwriting of the counsel for the claimant. Under this order a survey was made, and having been returned into this court at the instance of the New Almaden Company, the heirs of Berreyesa intervened, objected to the survey, and for the first time became parties to the controversy. The New Almaden Company also intervened and objected to the survey, and the parties proceeded to take testimony for and against it.

The Berreyesas having obtained a final confirmation, their rancho had been surveyed; and this survey, which adopted the same boundary line between the ranchos as that assumed in the Fossat survey, was also ordered into court on the application of the Berreyesas, in whose behalf exceptions are filed.

In this proceeding, the New Almaden Company, claiming under Castillero, and the Quicksilver Mining Company, claiming under Fossat, intervened and became parties. All parties being thus before the court, in each of the two suits, it proceeded to hear evidence and argument, and to decide upon

the disputed line between the ranchos. It was not pretended by the counsel who before this court represented Fossat, that the controversy had ever been decided by this court on its merits. It was not by any one suggested, or suspected by the court, that the supreme court had, on a motion to dismiss an appeal on the ground it was taken from a decree not final, but interlocutory, meant to affirm, or any way to pass upon the correctness of the decree appealed from.

This court, thereupon, after full argument and deliberation, determined, by a decision applicable to both cases, the common line of division between the ranchos. But even if the original decree, entered when Fossat and the United States alone were parties, had assumed to determine the boundary line between the ranchos, and if that decree had been affirmed, I should not have hesitated, when the surveys of both ranchos came up for approval, to determine their common line of division as might under the evidence then adduced have appeared to be just, and irrespective of any decree obtained by either disputant in the absence of his adversary. And this for the following reasons:

1. The first decree of this court had been reversed, and the cause remanded, with directions to declare the boundaries mentioned in the grant within which the league of Larios was to be taken. This the court had done, and expressed its decision in a decree. That decree the supreme court had declared to be interlocutory, and not final. For that reason alone the appeal had been dismissed, and this court had been directed to cause a survey to be made, which when approved and embodied in its decree, would impart to it finality. The survey in the Fossat Case had thus been made under a decree, which, by the positive declaration of the supreme court, was not a final, but merely an interlocutory decree. As such it was open to revision, until the court, by approving and adopting a survey, had made what the supreme court had declared would alone constitute a final decree in the cause.

2. It could not be pretended that the location of the dividing line was in any respect determined by the decree in the Berreyesa Case; for that decree merely described his land as "adjoining that of Justo Larios, with the boundaries mentioned in the grant and delineated on the diseño." Berreyesa, therefore, had in his own case a clear right to have his land surveyed as might appear to be just. He could not be bound by decrees entered in another suit between Fossat and the United States, in which he had not been heard, and to which he was not and could not have been a party. If, then, the survey of the Fossat Rancho was to be controlled by decrees previously entered in that suit, from which the court was not at liberty to depart, while the survey in the Berreyesa Case remained open to further inquiry, and subject to the de-cision of the court on the merits, the result must have been that two inconsistent surveys would have been approved, and overlapping patents issued.

To make inconsistent decrees, and approve conflicting surveys, I considered wholly inadmissible. It would only have produced future litigation unnecessary and vexatious; when all the parties were before the court, and were anxious for a determination by this court, and the supreme court on appeal, of the controversy which had so long been pending.

3. The decision of the supreme court, and the provisions of the act of 1860, had imposed upon this court the duty of establishing by a survey all the boundaries of the Fossat Rancho. As the northern line was to be run for quantity, it could only be fixed after all the other lines were determined. The dividing line between the ranchos had, therefore, first to be ascertained before the court or a surveyor could know where the northern line should be drawn, so as to make up the precise quantity of one league and no more.

If, then, Berreyesa, intervening for the first time in the cause, had practically no right to be heard, and if the location of the dividing line was to be considered as fixed by a decree made before he became a party to the suit, such a course could be consistent with the commonest rule of justice only on the hypothesis that the location did not and could not affect his rights, but that the final location of the line would remain open to contestation in the ordinary tribunals.

But if this were so, the attempt to determine the northern boundary was idle and vain; for if Fossat was to obtain exactly one league, and no more, the line run for quantity ought to be varied with every subsequent location of the disputed boundary. Justice and the interests of the United States, demanded, therefore, that in this and similar cases the lines between the claimant and his neighbors should be established before those run for quantity should be fixed; and it is obvious that this could be done only in a proceeding where the adjoining proprietors could appear, take evidence, and be heard, and in which they could not be bound by a decree entered in the suit before they were admitted as parties.

I have already observed that if, in a proceeding under the act of 1860 to correct a survey, the colindantes intervening in the suit are to be bound by the previous decree, it can only be on the theory that they are not affected by the survey, decree, or patent under it, but retain their rights unimpaired and capable of assertion in the ordinary tribunals.

But this theory would in practice be found deceptive, and the right of recourse to the ordinary tribunals illusory.

The California land claims are for the

most part founded on mere equities—the legal title remaining in the United States, to divest which a patent is necessary.

If, then, a grantee to whom a patent for a specified tract of land had been issued, were to attempt before the ordinary tribunals to assert a right under his original grant to land not covered by his patent; and if, in addition, the land thus claimed were included within the patent of a neighbor, to whom it had been surveyed and patented under another, and perhaps older, grant, it may well be doubted whether the bare statement of the case would not insure its dismissal by the ordinary tribunal. The "legal investigation and decision, by the proper judicial tribunal, of disputes between parties having interfering claims," which the act of 1851 contemplates, would, therefore, be found, after patents have been issued to both, a wholly unavailable remedy for the party injured by the erroneous determination of the dispute by the surveyor general, or an ex parte decision of it by the United States courts.

But if, to avoid this result, and to give to both parties an equal standing in the ordinary courts, conflicting decrees should be made and overlapping patents issued, it is evident not only that interminable litigation would ensue, but that one of the claimants would be wronged by the United States; for the unsuccessful party would lose a part of the land covered by his patent, and would fall short to the extent of the land in dispute of the quantity to which he was entitled by his grant.

On these grounds I was of opinion that where two or more surveys of coterminous ranchos are before the court, on proceedings under the act of 1860, where the controversy relates to their common boundary lines and all the claimants have intervened in and become parties to the suit with respect to each survey, it was the duty of the court to determine the dividing lines irrespective of any decree obtained by either as against the United States; and that to make conflicting decrees and issue overlapping patents, or to fix the lines according to decrees entered before the colindantes were heard in the cause, would, in the one case, involve the parties in vexatious litigation, and, in the other, practically deprive the colindante of his rights without a hearing.

The language of the act of 1860 appeared to this court not merely to justify, but to demand, this construction of its provisions. By the third section, all persons having an interest in, or whose rights are affected by any survey or location, are permitted to intervene. By the fourth section, the parties so intervening are allowed to take testimony "as to any matters necessary to show the true and proper location of the claim;" and the court. on hearing the allegations and proofs, is empowered to render judgment thereon; and if, in its opinion, the location and survey are erroneous, it is authorized to set aside and annul the same, or to correct and modify. 12 Stat. 34.

It will be perceived that the intervening parties are permitted to take testimony, not merely as to whether the survey conforms to a previous decree of the court, by which their rights may have been prejudged in their absence, but "as to any matters necessary to show the true and proper location of the claim;" and the court, after hearing the new allegations and proofs, is required to render judgment thereon, and to set aside the survey, not when it fails to conform to the previous decree, but whenever, after hearing the proofs, the location and survey are "in its opinion erroneous." If congress had intended to give to the courts the same powers as were conferred upon them by the acts of 1824 and 1828,—viz., to decide finally, after bringing before them all parties in interest, all questions relating to the extent, boundaries, and locality of the claims,—I know not what other language could have been used to express the intention.

But to construe the act as limiting the powers of the court on the intervention of parties previously strangers to the cause, to the inquiry whether the survey conformed to the decree already made, would defeat in great part the purpose of the law; for the determination of the court would settle nothing. It could not settle the dividing lines, for they would be fixed according to a decree made before the colindantes were heard; and even the exterior lines where the claim is bounded by public land could not rationally be considered as established, so long as the dividing lines by which in a grant for quantity they must necessarily be governed remained uncertain.

I have thought it right thus to explain fully the grounds on which the opinion of this court was based, in order that its action which has been so much criticised, may be thoroughly understood, and the nature of its errors (if errors it has committed) may be exactly appreciated. I have felt at liberty to do so, from the fact that in the recent opinion of the supreme court the question last considered is not discussed, but the construction given by the counsel for the claimant to the act of 1860 seems to have been adopted as necessarily and of course correct. I have explained the reasons for my opinions, not in any spirit of rebellion or protest against the authority which it is my duty and my desire to obey, but because I thought it just to present to the supreme court, it may be for the first time, the reasons which led me to arrive at a conclusion which it has pronounced to be incorrect, and to show that the action of this court, though perhaps erroneous, was not, as has been supposed, inconsistent, hasty, or inconsiderate.

. With respect to the supposed change of

the decrees of this court, I believe I have shown beyond controversy:

(1) That no decision was ever made, or intended to be made, of the dispute regarding the eastern line until the last decree under the provisions of the act of 1860, and that this court had good grounds for believing that it had no authority to make any such decision.

(2) That it was not aware, and had no reason to suspect, that any decree supposed to determine that line had been affirmed by the supreme court.

(3) That even if the fact had been otherwise, there were strong reasons for believing that a decree so entered in a suit between the United States and the claimants did not and ought not to bind other parties subsequently intervening for their interests under the provisions of the act of 1860.

I trust, therefore, that the injustice of the implied censure contained in the recent opinion of the supreme court will be recognized by that high tribunal.

It remains to determine how far the decision of the supreme court in the case of U. S. v. Fossat is decisive of the question raised in the case at bar. It will be observed, that though in the opinion of the supreme court it is distinctly declared that, in a proceeding under the act of 1860, the duties of this court are limited to an inquiry whether the survey conforms to the decree previously entered in the cause, yet that the location of the dividing line is discussed on its merits, and the location adopted by this court adjudged to be erroneous; that at least a majority of the court assented to its judgment is certain. But it may very possibly be that the assent was given by some of its members on the ground that they agreed on the question raised as to the true location of the eastern line, without concurring in the general principle announced, viz., that colindantes and other intervenors in a proceeding under the act of 1860, who then for the first time are heard in it, are bound by the terms of a decree entered when the only parties to the suit were the United States and the claimant. The volume containing the last decisions of the supreme court has not been received in this state. Whether or not a majority of the court adopted all the views expressed in the published opinion, I am uninformed. I only know that they assented to the judgment.

But on the hypothesis that they did, the case at bar is distinguishable from that of Fossat. Here the claimant has intervened and become a party to a proceeding which necessarily involved the determination of the common boundary line between the ranchos. From the decision in that proceeding he might have appealed, and in case the location of the Mesa Rancho as established by this court had been altered, there would still have been assigned to the claimant of that rancho the full quantity of land to which

he was entitled. As the case now stands, the owners of the Mesa Rancho can only obtain the land as surveyed and located under the decision of this court; and if the claim of the owners of the Rodriguez Ranch be allowed, their land will in part be located on the tract surveyed to Mesa, and overlapping patents must be issued creating certain litigation, and a possible loss by Mesa of a part of his land. The position of Rodriguez is thus closely analogous to what would be the position of Berreyesa if he should seek to have the line between him and Fossat adjudicated anew, according to the calls of his own decree.

It may well be doubted whether the supreme court would re-open the whole controversy, and on finding that the Berreyesa decree called for a line different from that called for in the Fossat decree, would make a new location of it, and direct overlapping patents to issue.

In the case at bar, the injustice of now depriving Mesa of a considerable portion of the land which, contrary to his own wishes, has been surveyed to him, is so manifest that I do not feel called upon, on the authority of a single case, where the effect and practical operation of the doctrines announced may not have been fully presented to the supreme court, to take from Mesa lands surveyed and perhaps patented, and for which there are now no means of giving him an equivalent by extending his lines in other directions.

I think, therefore, that the survey of the land confirmed to Rodriguez should be corrected by conforming the lines strictly to those called for in the decree, except that on the east it must follow the lines established by the final survey of the Mesa Rancho, as the lines of division between the ranchos.